FILED

2025 Jul-07  PM 03:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARSHAE SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-1349-AMM** |
| | ) | |
| **CITY OF BIRMINGHAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case is before the court on a partial motion to strike, Doc. 33, and a motion for summary judgment, Doc. 27, by defendant City of Birmingham ("the City"). For the reasons stated below, the partial motion to strike, Doc. 33, is **DENIED**, and the motion for summary judgment, Doc. 27, is **GRANTED**.

## I.    BACKGROUND

Darshae Smith began working for the City as a laborer in 2015. Doc. 26-1 at 32. In 2016, Ms. Smith filed an EEOC charge against the City in which she alleged that her supervisor, Gjamal Rodriguez, sexually harassed her and retaliated against her. *Id.* at 36–37, 144. The City terminated Ms. Smith's employment around March 2017. *Id.* at 33, 42. Ms. Smith testified that she was terminated because she did not wear the appropriate safety shoes. *Id.* at 34.

In June 2017, Ms. Smith filed a lawsuit based on the claims included in her EEOC complaint. *Id.* at 37–38, 148. The parties executed a settlement agreement in 2020, and her lawsuit was dismissed on that basis. *See id.* at 39–40, 157; Doc. 26-2. As part of the settlement, Ms. Smith waived current and future claims arising out of the claims alleged in her lawsuit:

> As part of this settlement . . . I agree that I am waiving and releasing the City from any and all claims that I have or may have against it based on or as a result of any acts or omissions first occurring on or before the day on which I sign this Settlement Agreement. I understand that this means I am giving up and will not be able to sue the City for any of the claims I am releasing.
>
> []I further understand and agree as follows:
>
> . . .
>
> c. That my waiver and release applies not only to all acts or omissions that have occurred as of the day of my signing of this Settlement Agreement, but also to the continuing effects or future results of any such acts or omissions[.]

Doc. 26-2 at 1.

In November of 2020, Ms. Smith applied for another laborer position with the City, and as part of her application, she attended a physical fitness test on December 3, 2020. Doc. 26-1 at 42–45, 159–70. Ms. Smith testified that her former supervisor, Mr. Rodriguez, was present at her test, talking with the test administrator and "looking at [her]," *Id.* at 48, 64–65. Ms. Smith did not overhear the conversation and

was not informed of the subject of the conversation by anyone. *Id.* at 65, 100. It is undisputed that Ms. Smith passed the fitness test. *See id.* at 47, 170; Doc. 26-5 ¶ 7.

Je'Nea Jones, the Deputy Director of the City's Human Resources Department at the time of these events, testified about the City's process for hiring candidates for the laborer position after the December 2020 fitness test. *See* Doc. 26-5 ¶¶ 1, 6. She explained that the names of candidates who "passed the physical agility test were placed in an online randomizer," and that "[c]andidates were called and offered the job, pending drug testing and pre-employment screening, based on the order they appeared on the randomly generated list." *Id.* ¶ 6. She testified that Ms. Smith's name was placed into the randomizer after she passed the December 2020 fitness test but that Ms. Smith did not receive a job offer "due to her random place on the list." *Id.* ¶¶ 7–8.

The City later changed the process for determining how candidates for the laborer position were hired. *See id.* ¶ 9. Ms. Jones testified that the new process offered available positions to those with the best scores on the fitness tests. *See id.* Because of the change in the selection process, Ms. Jones explained that "all candidates that remained on the December 2020 list that had not been extended a job offer[, including Ms. Smith,] were invited to re-apply so they could compete to be on the next Laborer eligible candidate list." *Id.* ¶¶ 10–11.

Andromeda Rhodes, who became a recruiter for the City in February of 2021, Doc. 26-3 at 14–15, emailed Ms. Smith and directed her to complete an online application for a laborer position, *id.* at 66; Doc. 26-1 at 53–55, 172. Ms. Rhodes testified that she emailed Ms. Smith and others because she "was unable to locate" their applications and therefore invited them to reapply. Doc. 26-3 at 66. Ms. Smith completed the application. Doc. 26-1 at 56; Doc. 26-5 ¶ 12.

Ms. Smith testified that she then called Ms. Rhodes to tell her that she completed the application, Doc. 26-1 at 56, and that "somewhere in between [twenty-four] to [seventy-two] hours, [she] got a call back from [Ms. Rhodes] discussing the pay rate and [a] start date" of March 15, 2021. *Id.* at 55–56. Ms. Smith also testified that Ms. Rhodes "basically" told her that she was hired and that she accepted the job on the phone. *Id.* at 55–56. Ms. Smith did not receive an offer letter or email about the job offer, instead stating that the offer "was verbal." *Id.* at 56.

Ms. Rhodes testified that she did not remember, but did not dispute, giving Ms. Smith a March 15, 2021, start date. Doc. 26-3 at 50. But she testified that the standard procedure for offering a candidate a laborer position is (1) to "call the candidate and make a verbal offer," (2) "the candidate [then] scheduled to take their pre-employment screening, which would be a physical, as well as a drug screening," (3) the candidate would "come to HR to complete new hire documents," and (4) while at HR, he or she would receive an official offer letter. *Id.* at 68–70. The offer

letter would contain details of the job and would inform the individual that the offer is contingent upon the candidate passing the fitness test and drug screening. *Id.* at 70–71. Ms. Rhodes never sent Ms. Smith an offer letter. *Id.* at 71.

Ms. Smith testified that she attempted to call Ms. Rhodes approximately one week before her start date, but Ms. Rhodes did not answer until two days after that date—March 17, 2024. *See* Doc. 26-1 at 57–59. Ms. Smith testified that "[b]efore [she] could even get [her] last name out," Ms. Rhodes told her that she had to "reconsider hiring" Ms. Smith "because [she] found out [she] was a rehire." *Id.* at 57–58.

Ms. Rhodes explained why she reconsidered hiring Ms. Smith. After she sent the email directing Ms. Smith to complete a job application, Ms. Rhodes saw that Ms. Smith "has a Rehire Code of Four" in the City's system, which means she is "ineligible to be rehired." *See* Doc. 26-3 at 50–51, 53, 76. Ms. Rhodes testified that the rehire code is the only reason that she did not hire Ms. Smith for the laborer position at that time. *Id.* at 58.

A rehire code is assigned by the Personnel Board of Jefferson County and indicates an individual's eligibility for rehire. *See id.* at 53–54. A person may have a rehire code of four due to the reason the individual was previously terminated. *See id.* at 50–51; Doc. 26-5 ¶ 13. Ms. Rhodes testified that no reason is listed explaining why Ms. Smith has a rehire code of four. Doc. 26-3 at 52.

Ms. Smith then called the City's Human Resources Department and talked to Cedrick Sparks about her reconsideration. Doc. 26-1 at 58. Ms. Smith testified that Mr. Sparks said he would look into the matter, but that she never heard back from anyone about the job. *Id.* at 58–59.

Ms. Jones testified that the Human Resources Department was "look[ing] into Ms. Smith's issue with the Laborer position based on Ms. Smith's conversation with [Mr.] Sparks." Doc. 26-5 ¶ 14. Although Ms. Smith had a rehire code of four, the Director of Human Resources determined that "Ms. Smith should be given another opportunity to participate in the Laborer selection process, and if she passed the physical agility test and, based on her time, she was the next Laborer that was due to be offered the job, [Human Resources] would re-evaluate her rehire code at that time." *Id.* ¶ 15.

Therefore, at Ms. Jones's instruction, Ms. Rhodes emailed Ms. Smith inviting her to participate in the next fitness test, which was scheduled to take place on April 9, 2021. *See id.* ¶ 16; Doc. 26-1 at 60–61, 173. Ms. Smith "ignored" the email because she "had already accepted" the job, had already completed a fitness test in December of 2020, and believed "it was irrelevant to [her]." Doc. 26-1 at 61–62. It is undisputed that Ms. Smith did not reach out to anyone about the fitness test and did not take the fitness test. *See id.* at 61–62; Doc. 26-5 ¶ 17. Ms. Jones testified that Ms. Smith did not receive an offer for a laborer position because she did not appear

for the fitness test and her name was therefore not on the list of eligible candidates. *See* Doc. 26-5 ¶ 19.

Ms. Rhodes testified that the results of a fitness test are valid for one year, so Ms. Smith's results from the December 2020 test could be used until December 2021. Doc. 26-3 at 27, 34. She also testified that the fitness test that was administered in December 2020 was the same test as the one administered in April 2021. *See id.* at 39. She testified that she invited Ms. Smith to take the April 2021 test based on Ms. Jones's instruction. *Id.* at 47–48.

Ms. Rhodes and Ms. Jones testified that they had no knowledge about Ms. Smith's EEOC complaint or lawsuit. *Id.* at 71; Doc. 26-5 ¶ 20. Ms. Rhodes testified that she had never had a conversation with Mr. Rodriguez or the test administrators about Ms. Smith. Doc. 26-3 at 71–72. And Ms. Jones testified that "[t]he departments with the vacant positions had no oversight or involvement in the selection decision for unclassified positions." Doc. 26-5 ¶ 5.

Mr. Rodriguez does not have authority to make hiring or firing decisions for the City, and although he sometimes offers an opinion about a decision, he has never discussed a hiring decision with Ms. Rhodes. Doc. 26-4 at 15–16, 28, 35. He testified that he did not discuss Ms. Smith with the test administrators or anyone in the City's Human Resources Department and that he did not "attempt to influence anyone not to rehire [Ms.] Smith." *Id.* at 35. Mr. Rodriguez also testified that he was unaware

of Ms. Smith's sexual harassment allegations against him until the present litigation, *id.* at 26–28, although he had heard about the lawsuit generally through "[p]eople just talking," *id.* at 29.

Ms. Smith filed a third EEOC charge and this lawsuit in which she asserts a claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981a, 2000e *et seq.* ("Title VII"). *See generally* Doc. 1. Based on her observation of Mr. Rodriguez speaking with a test administrator at her December 2020 fitness test, Ms. Smith testified that her "assumption" is that Mr. Rodriguez spoke with Ms. Rhodes about her prior sexual harassment claim and convinced the City to reconsider her job offer. *See* Doc. 26-1 at 68–69, 99–100.

The City moved for summary judgment in its favor. Doc. 27. The motion is fully briefed. Docs. 28, 32, 34. The City also moved to strike a spreadsheet attached to Ms. Smith's opposition to summary judgment because it is unauthenticated and is inadmissible hearsay. Doc. 33. That motion is also fully briefed. Docs. 38–39.

## II.    LEGAL STANDARD

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up). In deciding a motion for summary judgment, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III.    ANALYSIS

### A. The City's Motion To Strike

The City moved to strike a spreadsheet attached to Ms. Smith's opposition to summary judgment, arguing that it was not authenticated and that Ms. Smith failed to depose a representative for the City under Federal Rule of Civil Procedure 30(b)(6) who could have authenticated it. *See* Doc. 33 at 1–3. It also argues that the spreadsheet is inadmissible hearsay. *Id.* at 2.

Ms. Smith argues that the spreadsheet "was produced by the City during discovery and filed as part of [its] evidentiary submission in support of summary judgment" and that she is entitled to rely upon it. Doc. 38 at 1–2. She also argues that a City employee could testify at trial to authenticate it and that the document qualifies as an exception to the hearsay rule because it is a public record and a business record. *Id.* at 3–4.

In her opposition to the City's motion for summary judgment, Ms. Smith argues in part that the City's justification for not rehiring Ms. Smith (because she did not attend the April 2021 fitness test) is invalid. *See* Doc. 32 at 14. Ms. Smith attached a copy of a spreadsheet that she says shows the City hired individuals in April 2021 who did not take a fitness test. *See* Doc. 31-2 at 2; Doc. 32 at 14.

"On motions for summary judgment, [the court] may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (stating that a district court may consider evidence on summary judgment that can be reduced to an admissible form at trial). "Authentication is a condition precedent to admissibility." *Snover v. City of Starke*, 398 F. App'x 445, 449 (11th Cir. 2010) (cleaned up). The authentication of a document "can be accomplished through judicial admissions such as . . . production of items in response to . . .[a] discovery request." 31 Wright & Miller's *Federal Practice & Procedure* § 7105 (2d ed. 1982); *Cooper v. S. Co.*, 260 F. Supp. 2d 1258, 1272 n.7 (N.D. Ga. 2003).

The evidence at issue here would likely be admissible at trial. The City has not disputed Ms. Smith's assertion that it produced the spreadsheet in discovery. *See generally* Doc. 39. And the City included the spreadsheet as an exhibit to its motion for summary judgment. Doc. 26-3 at 208. Accordingly, the City cannot now

challenge its authenticity. In addition, Ms. Smith could assert a basis to admit the spreadsheet into evidence a trial. For instance, Ms. Smith could "put[] on testimony of [employees] who have personal knowledge" of it, *Jones*, 683 F.3d at 1294, or call the employees listed in the spreadsheet to testify at trial and asking them if they took the fitness test before being hired in April 2021.

Accordingly, the City's partial motion to strike, Doc. 33, is **DENIED**.

### B. The City's Motion for Summary Judgment

The City argues that it is entitled to summary judgment for three reasons: (1) Ms. Smith's claims against it are barred by the settlement agreement executed in her previous lawsuit, Doc. 28 at 13–14, (2) Ms. Smith failed to establish causation because "[t]here is nothing linking the decision not to extend an offer to Ms. Smith in 2021 to her filing an EEOC Charge or lawsuit," Doc. 34 at 5, and (3) Ms. Smith failed to prove that the City's reason for not hiring her for the laborer position was pretextual, Doc. 28 at 20.

Ms. Smith responds that (1) she did not release her future "rehire" claims by executing the settlement agreement, (2) the City waived the affirmative defense of release by failing to plead it in its answer, and (3) she has established her retaliation claim. Doc. 32 at 10–15.

### 1. The City waived a release defense.

Ms. Smith argues that the City failed to plead release as an affirmative defense in its answer to Ms. Smith's complaint and thereby waived that argument. *See* Doc. 32 at 11–12*; see generally* Doc. 12. The City apparently concedes as much as it does not argue otherwise in its reply. *See generally* Doc. 34 at 4. Release is an affirmative defense, and the failure to plead it in a defendant's answer results in waiver of that defense. *See* Fed. R. Civ. P. 8(c)(1); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017) ("In civil litigation, a release is an affirmative defense to a plaintiff's claim for relief. . . ."); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010).

By failing to plead release as an affirmative defense in its answer, the City has waived that defense. Therefore, the court need not determine whether the release in the settlement agreement encompasses Ms. Smith's current retaliation claim.

### 2. Ms. Smith failed to establish the causation element of her retaliation claim.

The retaliation provision of Title VII prohibits an employer from "discriminat[ing] against" an employee because she "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). "To survive summary judgment, the employee must present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation

against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023).

"To establish a claim of retaliation, [a plaintiff] must prove that she engaged in statutorily protected activity, that she suffered an adverse action, and that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). To establish causation, a plaintiff must prove "that the protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (cleaned up). In other words, "a plaintiff must prove that had she not complained, she would not have been" subjected to the alleged discriminatory action. *Id.* "Without any knowledge amongst the [employer] that [the plaintiff] engaged in protected activity, [the plaintiff] cannot show that the activity caused the adverse [action]." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1245 (11th Cir. 2016); *see, e.g.*, *Brown v. City of Opelika*, 211 F. App'x 862, 863–64 (11th Cir. 2006).

"Once the *prima facie* case is established . . . [t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Gogel v. Kia Motors Mfg. of Ga., Inc.,* 967 F.3d 1121, 1135 (11th Cir. 2020). "If the employer produces such a reason . . . the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask retaliatory actions." *Id*. (cleaned up).

The City concedes that Ms. Smith's EEOC complaints and lawsuit in 2016 and 2017 constitute protected activities and that failing to be rehired constitutes an adverse action. *See* Doc. 28 at 16. But it argues that Ms. Smith "has not presented sufficient evidence to satisfy the remaining causation element of her prima facie case[] for retaliation." *Id.* Ms. Smith argues that there is a genuine dispute of fact on her retaliation claim because of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's justification for not hiring her. Doc. 32 at 12 (cleaned up).

First, Ms. Smith argues that the City's proffered reason for not hiring her after she passed her December 2020 fitness test—because her name was not included in the list generated by the online randomizer—is implausible. *See* Doc. 32 at 13. In support of that argument, Ms. Smith cites Ms. Rhodes's testimony that she had never heard of the online randomizer. *Id.* (citing Doc. 26-3 at 57–58). But Ms. Jones testified that the City stopped using the online randomizer after Ms. Smith was not hired following her December 2020 fitness test, *see* Doc. 26-5 ¶¶ 8–9, and Ms. Rhodes was not in her recruiting position until February 2021, Doc. 26-3 at 14–15. Ms. Rhodes also testified that she had no personal knowledge of Ms. Smith's December 2020 fitness test. *Id.* at 63. Therefore, Ms. Rhodes's lack of knowledge about the online randomizer does not render the City's justification implausible.

Ms. Smith also argues that Ms. Rhodes "rescinded" Ms. Smith's March 15, 2021, hiring date because of her rehire code of four, and "[t]hat rehire code reason conflicts with the verified interrogatory response . . . which stated [Ms.] Smith was not re-employed due to her failure to retake . . . the April 9, 2021[,] physical agility [test] that she previously passed." Doc. 32 at 13.

But undisputed evidence resolves this purported conflict in the evidence. The undisputed testimony of Ms. Jones and Ms. Rhodes demonstrates that although Ms. Smith's March 15, 2021, start date was rescinded because of her rehire code, and Ms. Smith complained about the rescission with the Human Resources Department, the Director of Human Resources instructed Ms. Jones to invite Ms. Smith to participate in the April 2021 fitness test so that the City could reconsider her rehire code if she qualified for a position. Doc. 26-5 ¶¶ 13–16; Doc. 26-3 at 57–58. Ms. Smith does not dispute that she did not attend, nor call anyone about, that fitness test. *See* Doc. 26-1 at 61–62; Doc. 26-5 ¶ 17.

Ms. Smith also argues that "the hiring records reflect[] at least [five] applicants being hired on April 26, 2021 with no recorded test scores," which contradicts the City's justification for not rehiring Ms. Smith. Doc. 32 at 13–14. In support of that argument, Ms. Smith attached the previously-discussed spreadsheet produced by the City that lists individuals who were hired that do not have test times

listed by their names and suggests that these individuals were hired without a fitness test. *See id.* at 14; Doc. 31-2 at 2.

But this evidence is insufficient to create a genuine dispute of fact on Ms. Smith's retaliation claim. Even viewing the evidence in the light most favorable to Ms. Smith, the City's decision not to rehire her while hiring others who allegedly did not take a fitness test does not provide the necessary causal link between her prior claims and the City's decision, particularly when undisputed evidence establishes that the City's decisionmakers were unaware of her prior claims. *See* Doc. 26-3 at 71; Doc. 26-5 ¶ 20.

Finally, Ms. Smith asserts several arguments related to Mr. Rodriguez. She argues that Mr. Rodriguez was present at her December 2020 fitness test and that he sometimes offers opinions about hiring decisions. Doc. 32 at 14. But Mr. Rodriguez's presence at the December 2020 test did not adversely impact the results of that test—it is undisputed that Ms. Smith passed it. *See* Doc. 26-1 at 47, 170; Doc. 26-5 ¶ 7. And the undisputed testimony of both Mr. Rodriguez and Ms. Rhodes indicates that they never discussed Ms. Smith's application. Doc. 26-3 at 71–72; Doc. 26-4 at 35. Although Ms. Smith disputes Mr. Rodriguez's testimony that he was unaware of Ms. Smith's previous sexual harassment allegations against him, Doc. 32 at 8 (asserting that the City could not have denied Ms. Smith's sexual harassment allegations in the 2017 lawsuit without speaking with Mr. Rodriguez

about them), there is no evidence indicating that Mr. Rodriguez spoke with or influenced Ms. Jones or Ms. Rhodes in their decisions related to Ms. Smith.

For all these reasons, the court **GRANTS** the City's motion for summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the City's partial motion to strike, Doc. 33, is **DENIED**. The City's motion for summary judgment, Doc. 27, is **GRANTED**.

**DONE** and **ORDERED** this 7th day of July, 2025.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE